UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

**WILLIAM SWINT and ANNETTE DAFFIN**, on behalf of themselves and on behalf of all other similarly situated individuals,

Plaintiffs,

v.

**TRUVIEW BSI, LLC**,

Defendant.

Case No. 1:26-cv-02178-MKB-JAM

**CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs William Swint and Annette Daffin ("Plaintiffs") individually and on behalf of all others similarly situated, bring this Consolidated Class Action Complaint and allege the following against Defendant TruView BSI, LLC ("Defendant"), based upon personal knowledge with respect to Plaintiffs and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## SUMMARY OF THE CASE

1. Plaintiffs bring this Consolidated Class Action Complaint against Defendant for its failure to implement adequate administrative procedures to protect Plaintiffs' and Class Members' personally identifiable information ("PII" or "Private Information") from unauthorized access (the "Data Breach").

2. Defendant is a provider of comprehensive background screening, investigative services, and business intelligence.[1]

3. Plaintiffs and Class Members were required to provide Defendant with their Private

[1] https://truviewbsi.com/ (last visited June 1, 2026).

Information in connection with the services Defendant provides. Defendant had, and continues to have, a resulting duty to ensure the Private Information entrusted to it remains safeguarded from unauthorized access.

4. On March 4, 2026, Defendant determined that a cybercriminal may have accessed Private Information contained in its IT Network between July 18, 2024, and August 15, 2024.[2] Upon becoming aware of the unauthorized activity, Defendant launched an investigation to determine the scope and nature of the Data Breach.[3]

5. As part of its response to this matter, Defendant conducted a comprehensive review of the impacted files to determine what information was affected and to whom the information related.[4] The following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, and driver's license number.[5]

6. On or around April 8, 2026 – more than one and a half years after the Data Breach occurred – Defendant issued a notice of public disclosure about the Data Breach and began sending notice letters ("Notice") to impacted individuals.

7. In providing their Private Information to Defendant, Plaintiffs and Class Members reasonably expected this sophisticated business entity to keep their Private Information confidential and securely maintained, to use this information for business purposes, and to disclose it only as authorized. Defendant failed to do so, resulting in the unauthorized disclosure of Plaintiffs and Class Members' Private Information in the Data Breach.

8. Defendant breached its duties owed to Plaintiffs and Class Members by failing to safeguard the Private Information it collected and maintained, including by failing to use adequate,

---

[2] https://mm.nh.gov/files/uploads/doj/remote-docs/truview-bsi-20260408.pdf (last visited June 1, 2026).
[3] *Id.*
[4] *Id.*
[5] *Id.*

reasonable, and legally-compliant data security measures to safeguard Plaintiffs and Class Members' Private Information, which caused and allowed criminal hackers to access and steal thousands of individuals' Private Information in the Data Breach.

9. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs and Class Members' Private Information was a known risk to Defendant, and thus, Defendant knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition. Indeed, Defendant, is bound to specific safeguards for Private Information under federal law, knew the importance of proper data protection and was on notice that its systems were vulnerable.

10. Defendant failed to adequately protect Plaintiffs and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect confidential Private Information.

11. Defendant breached its duties and obligations by failing, in one or more of the following ways: (a) to comply with industry-standard data security practices like encryption of Private Information in transit and storage; (b) to warn Plaintiffs and Class Members of its inadequate data security practices; (c) to ensure legally compliant and industry standard data security measures to protect Private Information like multifactor authentication ("MFA"); (d) to use adequate monitoring and alerting methods, and consequentially failing to recognize or detect that Private Information network had been compromised and accessed until approximately nineteen months after the Data Breach[6]; (e) to utilize widely available software able to detect and prevent this type of attack; and (f) to otherwise secure the Private Information using reasonable

[6] https://mm.nh.gov/files/uploads/doj/remote-docs/truview-bsi-20260408.pdf (last visited June 1, 2026).

and effective data security procedures free of foreseeable vulnerabilities and data security risks.

12. Hackers targeted and obtained Plaintiffs and Class Members' Private Information because of the data's value in exploiting and stealing their identities. As a direct and proximate result of Defendant's inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiffs and Class Members' Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals, and almost certainly published on the dark web. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

13. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent even possible, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

14. The risk of identity theft caused by this Data Breach is impending and has materialized, as there is evidence that the Plaintiffs and Class Members' Private Information was targeted, accessed, misused, and disseminated on the dark web.

15. As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual

identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect it.

16. To recover for these harms, Plaintiffs, on behalf of themselves and the Class as defined herein, bring claims for negligence/negligence *per se*, breach of implied contract, unjust enrichment, and violations of the California Consumer Privacy Act ("CCPA"), Cal. Civil Code Sec. 1798.150, *et seq.*, to address Defendant's inadequate safeguarding of Plaintiffs and Class Members' Private Information.

## I. PARTIES

17. Plaintiff William Swint is a citizen and resident of Stanton, California, where he intends to remain.

18. Plaintiff Annette Daffin is a citizen and resident of Clarksville, Tennessee, where she intends to remain.

19. Defendant is a limited liability company organized under the laws of the State of New York, maintaining its principal place of business at 225 Broadhollow Road, Suite 304, Melville, New York 11747. Upon information and belief, Defendant's president is Nicholas M. Auletta, who is a citizen of the State of New York. Upon information and belief, all of Defendant's members are citizens of the State of New York..

## II. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of

$5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different than Defendant, including Plaintiffs.

21. For purposes of CAFA, 28 U.S.C. § 1332(d)(10) provides that an unincorporated association is deemed to be a citizen of the state where it has its principal place of business and the state under whose laws it is organized. Defendant's principal place of business is in New York, and it is organized under New York law. Additionally, and in the alternative, under the traditional member-citizenship test, upon information and belief, all of Defendant's members are citizens of the State of New York. Defendant is therefore a citizen of New York. Plaintiffs are citizens of California and Tennessee, respectively, establishing minimal diversity.

22. This Court has personal jurisdiction over Defendant because its principal place of business is in this state and Defendant regularly conducts business in this state.

23. Venue is proper under 28 U.S.C § 1391(b)(1) because Defendant resides in this District.

## III. GENERAL FACTUAL ALLEGATIONS

### A. Defendant Collected, Maintained, and Shared Plaintiffs and Class Members' Private Information to Facilitate its Business, and Had Duties to Protect It.

24. Defendant is a provider of comprehensive background screening, investigative services, and business intelligence.[7]

25. Plaintiffs and Class Members received or sought services from Defendant prior to the Data Breach. As a condition of receiving or seeking Defendant's services, Plaintiffs and Class Members were required to provide Defendant with their sensitive and non-public Private Information.

---

[7] https://truviewbsi.com/ (last visited June 1, 2026).

26. Defendant used Plaintiffs and Class Members' Private Information in its business to derive economic benefits, including for marketing purposes, and could not operate or profit without that data.

27. In exchange for receiving Plaintiffs and Class Members' Private Information, Defendant promised to safeguard the sensitive and confidential data, to use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

28. Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and protected against unauthorized access. Consumers, in general, demand security for their Private Information, especially when Social Security numbers are involved.

29. Defendant had and continues to have duties to adopt reasonable measures to keep Plaintiffs and Class Members' Private Information confidential and protected from disclosure to unauthorized third parties, and to audit, monitor, and verify the integrity and cybersecurity of its systems.

30. Defendant had and continues to have, obligations stemming from the Federal Trade Commission ("FTC") Act, common law, contract, and industry standards, to keep Plaintiffs and Class Members' Private Information confidential and protected from unauthorized disclosure.

31. Additionally, by obtaining, using, and benefitting from Plaintiffs and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting that Private Information from unauthorized access and disclosure. In fact, in the Privacy Policy posted on Defendant's website, Defendant state that,

"we will not release your Personal Information to a third party unless you have granted us permission to do so."[8]

32. Defendant also owed a duty to protect Plaintiffs and Class Members from the harm insufficient data security and the consequential exposure of Private Information would cause, because such harm was foreseeable and reasonably preventable.

33. Defendant knew it was storing valuable, sensitive Private Information and that as a result, its systems would be an attractive target for cybercriminals.

34. Defendant also knew that any breach of its network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information was compromised, as well as intrusion into their private and sensitive financial matters.

35. Defendant's duty to protect Plaintiffs and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would cause obligated Defendant to require and ensure it had implemented reasonable practices to keep Plaintiffs and Class Members' sensitive Private Information confidential and securely maintained, used and disclosed it for necessary and authorized purposes only, deleted the data from network systems or applications when no longer necessary for legitimate business purposes, and trained employees on reasonable cybersecurity red flags and protection techniques.

36. Defendant owed the foregoing duties to protect Private Information in its custody from unauthorized disclosure, and Defendant had the practical ability to fulfill those duties—yet, it failed to do so, causing the Data Breach.

37. The Private Information Defendant stored on its network systems when the Data

[8] https://truviewbsi.com/privacy-policy/ (last visited June 1, 2026).

Breach occurred, included the unencrypted Private Information of Plaintiffs and Class Members.

**B. The Data Breach.**

38. On March 4, 2026, Defendant determined that a cybercriminal may have accessed Private Information contained in its IT Network between July 18, 2024, and August 15, 2024.[9] Upon becoming aware of the unauthorized activity, Defendant launched an investigation to determine the scope and nature of the Data Breach.[10]

39. As part of its response to this matter, Defendant conducted a comprehensive review of the impacted files to determine what information was affected and to whom the information related.[11] The following types of Private Information were compromised as a result of the Data Breach: name, Social Security number, and driver's license number.[12]

40. On or around April 8, 2026 – more than one and a half years after the Data Breach occurred – Defendant issued a notice of public disclosure about the Data Breach and began sending Notices to impacted individuals.

41. Plaintiffs and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Defendant's deficient security for customers' data caused and allowed criminals to target and take files containing Plaintiffs and Class Members inadequately protected, unencrypted Private Information from Defendant's possession through the Data Breach.

42. Defendant also violated its duties under New York law by failing to timely and accurately disclose the Data Breach. *See* N.Y. Gen. Bus. Law § 899-aa(2) which requires that notification be issued "in the most expedient time possible and without unreasonable delay,

---

[9] https://mm.nh.gov/files/uploads/doj/remote-docs/truview-bsi-20260408.pdf (last visited June 1, 2026).
[10] *Id.*
[11] *Id.*
[12] *Id.*

provided that such notification shall be made within thirty days after the breach has been discovered." Here, Defendant waited more than one and a half years after the Data Breach occurred, to issue a public disclosure. Defendant failed to meet the requirement set forth in N.Y. Gen. Bus. Law § 899-aa(2), depriving Plaintiffs and Class Members of the earliest possible time to begin remedying the harms the Data Breach presents and therefore exacerbating their injuries.

43. As the Data Breach and its timeline evidences, Defendant did not use reasonable security measures appropriate to the nature of the sensitive Private Information Plaintiffs and Class Members provided it, such as encrypting the information; deleting the data when it was no longer needed; revoking employee user accounts' access to servers storing Private Information when such access was no longer needed; restricting access to the servers storing Private Information to only employees that are necessary and adequately trained to prevent unauthorized use of their login credentials; requiring sufficient verification such as MFA for user accounts to access servers storing Private Information; training employees about cybersecurity and attempts to gain unauthorized access; investigating and addressing vulnerabilities in its data security practices; and/or implementing the necessary safeguards to identify malicious activity. These failures allowed and caused cybercriminals to target Defendant's systems and carry out the Data Breach.

### C. The Data Breach Was Foreseeable, and the Defendant Was Aware of Its Risk

44. It is well known that Private Information, including names, Social Security numbers, and driver's license numbers in particular, are invaluable commodities and a frequent target of hackers.

45. In 2023, a record 3,205 data breaches occurred in the United States, resulting in about 349,221,481 sensitive records being exposed, a greater than 100% increase from 2019.[13]

[13] ITRC (Identity Theft Resource Center), *2023 Data Breach Report* (January 2024), *available at* https://www.idtheftcenter.org/publication/2023-data-breach-report/

46. Individuals place a high value not only on their Private Information but also on the privacy of that data. For the individual, identity theft causes significant negative financial impact on victims as well as severe distress and other strong emotions and physical reactions.

47. In light of recent high profile data breaches at other industry leading companies, including LoanDepot (16.9 million affected, January 2024), Evolve Bank & Trust (7.6 million affected, May 2024), Financial Business and Consumer Solutions (4.2 million affected, February 2024), and Prudential Financial (2.5 million affected, February 2024), and in light of the highly-publicized data breaches other companies have suffered as recently as 2024, Defendant knew or should have known that its electronic records would be targeted by cybercriminals.

48. Indeed, cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of and take appropriate measures to prepare for and are able to thwart such an attack.

49. Despite the prevalence of public announcements of data breach and data security compromises, and despite their own acknowledgment of its duties to keep Private Information private and secure, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and the proposed Class from being compromised.

**D. Data Breaches are Preventable**

50. Data breaches are preventable.[14] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[15] She added that "[o]rganizations that collect, use, store, and share sensitive personal

---

[14] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).
[15] *Id.* at 17.

data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[16]

51. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

52. Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting its equipment and computer files containing Private Information.

53. To prevent and detect cyber-attacks and/or ransomware attacks, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, patients and individuals should be aware of the threat of ransomware and how it is delivered.
- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.
- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.
- Configure firewalls to block access to known malicious IP addresses.
- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.
- Set anti-virus and anti-malware programs to conduct regular scans automatically.

[16] *Id.* at 28.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[17]

54. To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**
- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

[17] Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide, at 3–4 (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf.

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office[Visual Basic for Applications].[18]

55. Given that Defendant was storing the Private Information of Plaintiffs and Class Members, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

56. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of Plaintiffs and Class Members.

[18] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

**E. Defendant Knew of the Risk of a Cyberattack because Companies in Possession of Private Information are Particularly Susceptible.**

57. Defendant's negligence, including its gross negligence, in failing to safeguard Plaintiffs and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

58. Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the internet black market known as the dark web.

59. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as his or her name, and Social Security number. This may be accomplished alone, or in combination with other personal or identifying information connected or linked to an individual such as his or her birthdate, birthplace, and mother's maiden name.

60. Data thieves regularly target entities that store Private Information like Defendant due to the highly sensitive information they maintain. Defendant knew and understood that Plaintiffs and Class Members' Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize it through unauthorized access.

61. Cyberattacks against institutions such as Defendant are targeted and frequent. According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[19]

---

[19] *See* Identity Theft Res. Ctr., *2021 Annual Data Breach Report Sets New Record for Number of Compromises*, ITRC (Jan. 24, 2022), https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises.

62. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant itself.

63. Defendant knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for it.

64. As a company in possession of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its network systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to a breach. Nevertheless, Defendant failed to implement or follow reasonable cybersecurity measures to protect against the Data Breach.

65. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

66. Defendant was, or should have been, fully aware of the unique type and the significant volume of Private Information on its server, and, thus, the thousands of individuals who would be harmed by the unauthorized exposure of that unencrypted data.

67. Given the nature of the Data Breach, it was foreseeable that Plaintiffs and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs and Class Members' names.

68. Plaintiffs and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices and procedures. The breadth of data compromised in the

Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, financial fraud, and the like.

**F. Defendant Was Required, But Failed, to Comply with FTC Rules and Guidance.**

69. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

70. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like Defendant. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

71. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

72. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

73. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ

reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendant must undertake to meet their data security obligations.

74. Such FTC enforcement actions include actions against businesses that fail to use adequate data security practices like Defendant. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

75. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duties in this regard.

76. Defendant failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

77. Defendant's failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**G. Defendant Failed to Comply with Industry Standards.**

78. A number of published industry and national best practices are widely used as a go-to resource when developing an institution's cybersecurity standards.

79. The Center for Internet Security's (CIS) Critical Security Controls (CSC)

recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

80. The National Institute of Standards and Technology ("NIST") also recommends certain practices to safeguard systems, such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

81. Further still, CISA makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing

updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.

82. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs and Class Members' Private Information, resulting in the Data Breach.

### H. Defendant Owed Plaintiffs and Class Members a Common Law Duty to Safeguard their Private Information.

83. In addition to its obligations under federal and state laws, Defendant owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendant's duty owed to Plaintiffs and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that the

servers, networks, and protocols storing Plaintiffs and Class Members' Private Information adequately protected it.

84. Defendant owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its custody.

85. Defendant owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

86. Defendant owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

87. Defendant owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

88. Defendant owed these duties of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

89. Defendant tortiously failed to take precautions required to safeguard and protect Plaintiffs and Class Members' Private Information from unauthorized disclosure. Defendant's actions and omissions represent a flagrant disregard of Plaintiffs and Class Members' rights.

**I. Plaintiffs and Class Members Suffered Common Injuries and Damages.**

90. Defendant's failure to ensure adequate data security measures for Plaintiffs and Class Members' Private Information directly and proximately caused injuries to Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

91. The ramifications of Defendant's failures to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

92. Plaintiffs and Class Members are also at a continued risk because their Private

Information remains on Defendant's server, which has already been shown to be susceptible to compromise and is subject to further attack so long as Defendant fails to undertake the necessary and appropriate security measures to protect consumers' Private Information in its care.

93. As a result of Defendant's ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiffs and Class Members' Private Information ending up in criminals' possession, all Plaintiffs and Class Members have suffered and will continue to suffer the following actual injuries and damages, without limitation: (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; (h) actual identity theft and fraud; and (i) the continued risk to their sensitive Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

***Present and Ongoing Risk of Identity Theft to Plaintiffs and Class Members***

94. Plaintiffs and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

95. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

96. The dark web is an unindexed layer of the internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

97. A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, stolen Private Information like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.

98. The unencrypted Private Information of Plaintiffs and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized actors can easily access and misuse Plaintiffs and Class Members' Private Information due to the Data Breach.

99. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of

an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[20]

100. According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[21] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[22]

101. In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[23] Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits.

102. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual,

---

[20] Social Security Admin., Pub. No. 06-10064, *Identity Theft and Your Social Security Number* (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[21] *See* Social Security Admin., *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm

[22] *Id.*

[23] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft

ongoing fraud activity to obtain a new number.

103. Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

104. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.

105. For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."); *see also McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 272 (S.D.N.Y. Mar. 8, 2021) (noting that Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves"; Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value

[24] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft

in that it is immutable," and when stolen can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.").

106. Similarly, California's Attorney General warns consumers: "Originally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits. But over the years, it has become much more than that. It is the key to a lot of your personal information. With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[25]

107. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

108. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

109. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[26]

---

[25] *See* Office of the Attorney General of Cal., *Your Social Security Number: Controlling the Key to Identity Theft*, https://oag.ca.gov/idtheft/facts/your-ssn

[26] "Fullz" is fraudster speak for data that includes the victim's information, including but not limited to name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with

110. With Fullz packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

111. The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

112. Victims of identity theft suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[27]

---

the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Recs. for Sale in Underground Stolen from Texas Life Ins. Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

[27] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.

113. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

114. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

115. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

116. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

117. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

118. In the event that Plaintiffs and Class Members experience actual identity theft and

fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[28]

119. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

120. Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

121. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

122. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendant's conduct that caused the Data Breach.

[28] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/ new.items/d07737.pdf (last visited June 1, 2026) ("GAO Report").

### *Diminished Value of Private Information*

123. Private Information is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

124. For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves.

125. Private Information can sell for as much as $363 per record according to the Infosec Institute.

126. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

127. As a result of the Data Breach, Plaintiffs and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

128. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private

Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Reasonable and Necessary Future Cost of Credit and Identity Theft Monitoring***

129. To date, Defendant has done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

130. Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

131. Such fraud may go undetected until debt collection calls commence months or even years later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

132. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers). Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future, if not forever.

133. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

***Loss of Benefit of the Bargain***

134. Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

135. When agreeing to provide their Private Information, which was a condition precedent to obtain services from Defendant, and paying Defendant, directly or indirectly, for these products and services, Plaintiffs and Class Members as consumers understood and expected that they were, in part, paying a premium for services and data security to protect the Private Information they were required to provide.

136. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than they reasonably expected to receive under the bargains struck with Defendant.

## IV. PLAINTIFFS' EXPERIENCES AND INJURIES

***William Swint***

137. Plaintiff Swint is a former client of Defendant. As a condition of receiving services from Defendant, Plaintiff Swint was required to supply Defendant with his Private Information.

138. Plaintiff Swint received Notice from Defendant about the Data Breach. Dated April 8, 2026.[29] The Notice informed Plaintiff Swint that a cybercriminal may have accessed PII within

[29] Plaintiff Swint's Notice is attached hereto as **Exhibit A**.

Defendant's environment between July 18, 2024, and August 15, 2024, and that the information potentially involved includes his driver's license number, and Social Security number.

139. Plaintiff Swint greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Swint diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

140. Upon information and belief, at the time of the Data Breach, Defendant retained Plaintiff Swint's Private Information on its network systems with inadequate data security, causing Plaintiff Swint's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

141. As a result of the Data Breach, Plaintiff Swint has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching and verifying the legitimacy and underlying facts of the Data Breach, reviewing account statements and credit histories, and other mitigation efforts—valuable time he otherwise would have spent on other like work and/or recreation. This time has been lost forever and cannot be recaptured.

142. Plaintiff Swint further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Swint is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

143. The risk of identity theft is imminent and has materialized, as Plaintiff Swint's and Class Members' Private Information was targeted by cybercriminals, accessed, stolen, and misused.

144. Plaintiff Swint further believes his Private Information, and that of Class Members, was and will be sold and disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

145. The Data Breach has caused Plaintiff Swint to suffer fear, anxiety, and stress.

146. As a result of the Data Breach, Plaintiff Swint anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

147. As a result of the Data Breach, Plaintiff Swint is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

148. Plaintiff Swint has a continuing interest in ensuring that his Private Information, upon information and belief, remain backed up in Defendant's possession, is protected and safeguarded from future breaches.

***Annette Daffin***

149. Upon information and belief, Plaintiff Annette Daffin's PII was collected and maintained by Defendant in connection with a background screening investigation performed on behalf of one of Defendant's clients. Defendant's records identified Plaintiff Daffin under her maiden name, Annette Tucker.

150. On or about April 8, 2026, Plaintiff Daffin received Notice from Defendant addressed to "Annette Tucker" at her home address in Clarksville, Tennessee.[30] The Notice informed Plaintiff Daffin that a cybercriminal may have accessed PII within Defendant's environment between July 18, 2024, and August 15, 2024, and that the information potentially involved includes her name and Social Security number.

---

[30] Plaintiff Daffin's Notice is attached hereto as **Exhibit B**.

151. Plaintiff Daffin trusted Defendant to use reasonable measures to protect her PII. Plaintiff Daffin is careful about sharing her sensitive personal information and stores documents containing such information in a safe and secure location.

152. Since the Data Breach, Plaintiff Daffin has experienced a noticeable increase in spam telephone calls and spam email messages.

153. Since the Data Breach, Plaintiff Daffin has been notified that her personal information has been found on the dark web.

154. Plaintiff Daffin fears for the security of her PII. As a result of the Data Breach, Plaintiff Daffin has suffered and will continue to suffer anxiety, stress, and concern about the misuse of her personal information.

155. Plaintiff Daffin faces a substantial and ongoing risk of identity theft and fraud as a result of the compromise of her Social Security number and other PII in the Data Breach. Because Social Security numbers are immutable, this risk will persist indefinitely.

156. Plaintiff Daffin has spent and will continue to spend time and effort monitoring her financial accounts and credit reports for unauthorized activity, responding to the Data Breach notification, and taking other protective measures—valuable time she otherwise would have spent on work or personal activities. This time has been lost and cannot be recaptured.

157. Plaintiff Daffin further anticipates spending considerable time and money on an ongoing basis to mitigate and address harms caused by the Data Breach.

158. Plaintiff Daffin has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from further breaches.

## V. CLASS ACTION ALLEGATIONS

159. Plaintiffs bring this Consolidated Class Action Complaint individually and on

behalf of all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

160. Plaintiffs seek to represent a Class defined as:

> All individuals in the United States whose Private Information may have been compromised in the Data Breach (the "Nationwide Class").

161. In addition, Plaintiff Swint seeks to represent a California Subclass defined as:

> All individuals residing in the State of California whose Private Information may have been compromised in the Data Breach (the "California Subclass").

162. Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

163. Plaintiffs reserve the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

164. <u>Numerosity</u>. The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. Although the precise number of individuals is currently unknown to Plaintiffs and exclusively in the possession of Defendant, upon information and belief, the number of Class Members is thousands of individuals. The Class is identifiable within Defendant's records.

165. Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

b. Whether Defendant had a duty not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

c. Whether Defendant failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

d. Whether and when Defendant actually learned of the Data Breach;

e. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

f. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

g. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the PII compromised in the Data Breach;

h. Whether Defendant adequately addressed the vulnerabilities which permitted the Data Breach to occur;

i. Whether Plaintiffs and Class Members are entitled to actual damages, compensatory damages, punitive damages, and/or nominal damages as a result of Defendant's wrongful conduct; and

j. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress

the imminent and currently ongoing harm faced as a result of the Data Breach.

166. Typicality. Plaintiffs' claims are typical of those of the other members of the Class because Plaintiffs, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

167. Adequacy. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action and data breach litigation, and Plaintiffs intend to prosecute this action vigorously.

168. Superiority and Manageability. The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

169. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would

necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

170. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

171. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

172. Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

173. <u>Policies Generally Applicable to the Class.</u> This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies

hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE PER SE
### (On Behalf of Plaintiffs and the Nationwide Class)

174. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 173 above as if fully set forth herein.

175. Defendant required Plaintiffs and Class Members to submit confidential Private Information to Defendant as a condition of receiving or seeking Defendant's services and or employment.

176. Plaintiffs and Class Members provided their Private Information to Defendant prior to the Data Breach.

177. Defendant had full knowledge of the sensitivity of the Private Information entrusted to it, and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendant had duties to Plaintiffs and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

178. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendant.

179. Plaintiffs and Class Members had no ability to protect their Private Information in Defendant's possession.

180. By collecting, storing, and benefitting from Plaintiffs and Class Members' Private Information, Defendant had a duty of care to require and ensure reasonable means to secure and

safeguard the data, prevented its disclosure, and safeguarded the Private Information from theft.

181. Defendant's duty of care obligated it to use processes by which it could detect if its network was breached or if Private Information was exposed to unauthorized actors.

182. Defendant's duty of care further obligated it to maintain processes sufficient to detect unauthorized access to its network or compromises of Private Information stored therein.

183. Defendant owed a duty to Plaintiffs and Class Members to implement and maintain data security measures consistent with industry standards and legal and regulatory requirements, to ensure that its systems and servers and the people and entities with access to them adequately protected Plaintiffs and Class Members' Private Information.

184. Defendant was able to ensure its data security procedures were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiffs and Class Members were not.

185. Defendant had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

186. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' Private Information.

187. Had Defendant ensured it implemented data security protocols, the Data Breach would have been avoided, or its resulting damage to Plaintiffs and the Class at least significantly reduced and the amount of Private Information compromised could have been greatly lessened.

188. Defendant's violations of the FTC Act as described herein directly caused and/or

were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and Class Members.

189. Plaintiffs and Class Members are within the class of persons the FTC Act was intended to protect.

190. The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against.

191. Defendant's failures to comply with the FTC Act is negligence *per se* and/or prima facie evidence of negligence.

192. Defendant's duties to use reasonable care in protecting Plaintiffs and Class Members' Private Information arose not only as a result of the statutes and regulations described above, but because Defendant is bound by industry standards to secure such Private Information.

193. Defendant breached its duties and was negligent by failing to use reasonable measures to protect Plaintiffs and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by Defendant are detailed *supra* and include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs and Class Members' Private Information;

b. Failing to implement and maintain cybersecurity practices that could detect and protect against unauthorized access to or use of Private Information;

c. Failing to adequately monitor or supervise its data security practices; and

d. Failure to periodically ensure it had plans in place to maintain reasonable data security safeguards, or to adequately test those plans.

194. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiffs and Class Members, the Data Breach would not have occurred or at least would have been

mitigated, Plaintiffs and Class Members' Private Information would not have been compromised, and Plaintiffs and Class Members' injuries would have been avoided.

195. It was foreseeable that Defendant's failures to use reasonable measures to protect Plaintiffs and Class Members' Private Information would injure Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable to Defendant given the known high frequency of cyber-attacks and data breaches in Defendant's industry.

196. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs and Class Members' Private Information would cause them one or more types of injuries.

197. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of their bargain; and (f) the continued and certainly increased risk to their Private Information, which remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

198. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

199. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

200. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 173 above as if fully set forth herein.

201. Defendant required Plaintiffs and Class Members to provide and entrust their Private Information to Defendant as a condition of obtaining Defendant's services.

202. When Plaintiffs and Class Members provided their Private Information to Defendant, they entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such Private Information.

203. Specifically, Plaintiffs and Class Members entered into valid and enforceable implied contracts with Defendant when they agreed to provide their Private Information and/or payment to Defendant.

204. The valid and enforceable implied contracts that Plaintiffs and Class Members entered into with Defendant included Defendant's promises to protect Private Information it collected from Plaintiffs and Class Members, or created on its own, from unauthorized disclosures through reasonable and legally compliant safeguards. Plaintiffs and Class Members provided this Private Information in reliance on Defendant's promises.

205. Under the implied contracts, Defendant promised and was obligated to (a) provide services to Plaintiffs and Class Members; and (b) protect Plaintiffs and Class Members' Private Information provided to obtain such services and/or created in connection therewith. In exchange, Plaintiffs and Class Members agreed to provide Defendant with payment and their Private Information.

206. Defendant promised and warranted to Plaintiffs and Class Members, including to

maintain the privacy and confidentiality of the Private Information it collected from Plaintiffs and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

207. Defendant's adequate protection of Plaintiffs and Class Members' Private Information was a material aspect of these implied contracts.

208. Defendant solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiffs and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

209. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act and industry standards.

210. A meeting of the minds occurred when Defendant required Plaintiffs and the Class Members to provide their Private Information as a mandatory condition to their receipt of services and when Plaintiffs and Class Members agreed to, and did, provide their Private Information to Defendant.

211. Plaintiffs and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendant.

212. Defendant materially breached its contractual obligations to protect the Private Information it required Plaintiffs and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to Defendant's inadequate data security measures and procedures.

213. Defendant materially breached the terms of its implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in

laws like Section 5 of the FTC Act and by failing to otherwise protect Plaintiffs and Class Members' Private Information, as set forth *supra*.

214. The Data Breach was a reasonably foreseeable consequence of Defendant's conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiffs and Class Members.

215. As a result of Defendant's failures to fulfill the data security protections promised, Plaintiffs and Class Members did not receive the full benefit of their bargains with Defendant, and instead received services of a diminished value compared to that described in the implied contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

216. Had Defendant disclosed that its data security procedures were inadequate or that they did not adhere to applicable law or industry standards for cybersecurity, neither Plaintiffs, Class Members, nor any reasonable person would have contracted with or provided Private Information Defendant.

217. As a direct and proximate result of Defendant's breach of their implied contracts with Plaintiffs and Class Members and the consequential Data Breach, Plaintiffs and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendant.

218. Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Nationwide Class)**

219. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 173 above as

if fully set forth herein.

220. Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their payment and or labor and their Private Information to Defendant. In exchange, Plaintiffs and Class Members should have had their Private Information protected with adequate data security.

221. Defendant knew Plaintiffs and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting, retaining, using, and profiting off managing the Private Information entrusted to it. Defendant profited from Plaintiffs retained data and used Plaintiffs and Class Members' Private Information for business purposes and to generate revenue, including by using the Private Information for marketing and analytics purposes.

222. Defendant failed to use reasonable or adequate measures to secure Plaintiffs and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

223. Defendant acquired the Private Information through inequitable record retention as they failed to investigate and/or disclose the inadequate data security practices previously alleged.

224. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures, while profiting from that same Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures, and diverting those funds to Defendant's own pocket.

225. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security and the safety of customers' Private Information.

226. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon it.

227. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injuries and damages as set forth herein.

228. Plaintiffs and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant for its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT ("CCPA")**
**Cal. Civil Code Sec. 1798.150, *et seq.***
**(On Behalf of Plaintiff Swint and the California Subclass)**

229. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 173 above as if fully set forth herein.

230. This claim is alleged on behalf of Plaintiff Swint (referred to as "Plaintiff" throughout this claim) and on behalf of the California Subclass (referred to as "California Subclass Members" throughout this claim).

231. The California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150(a), creates a private cause of action for violations of the CCPA.

232. Section 1798.150(a) specifically provides:

> Any consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for any of the following:

i. To recover damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty ($750) per consumer per incident or actual damages, whichever is greater.
ii. Injunctive or declaratory relief.
iii. Any other relief that court deems proper.

233. Defendant is a "business" under § 1798.140(d) in that it is a for-profit entity that collects consumers' personal information and, upon information and belief, annually buys, sells, or shares the personal information of 100,000 or more consumers or households in connection with its background screening services.

234. Plaintiff and California Subclass Members are covered "consumers" under § 1798.140(g) in that they are natural persons who are California residents.

235. The personal information of Plaintiff and the California Subclass Members at issue in this lawsuit constitutes "personal information" under § 1798.150(a) and 1798.81.5, in that the personal information Defendant collects and which was impacted by the cybersecurity attack includes an individual's PII.

236. Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the California Subclass Members' personal information and that the risk of a data breach or theft was highly likely. Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information of Plaintiff and the California Subclass Members. Specifically, Defendant subjected Plaintiff's and the California Subclass Members' nonencrypted and nonredacted personal information to an unauthorized access and exfiltration, theft, or disclosure as a result of the Defendant's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information, as

described herein.

237. As a direct and proximate result of Defendant's violation of its duty, the unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and California Subclass Members' personal information included exfiltration, theft, or disclosure through Defendant's servers, systems, and website, and/or the dark web, where hackers further disclosed the personal identifying information alleged herein.

238. As a direct and proximate result of Defendant's acts, Plaintiff and the California Subclass Members were injured and lost money or property, including but not limited to the loss of Plaintiff's and California Subclass Members' legally protected interest in the confidentiality and privacy of their personal information, stress, fear, and anxiety, nominal damages, and additional losses described above.

239. Section 1798.150(b) specifically provides that "[n]o [prefiling] notice shall be required prior to an individual consumer initiating an action solely for actual pecuniary damages."

240. Accordingly, Plaintiff and the California Subclass Members, by way of this complaint seek actual pecuniary damages suffered as a result of Defendant's violations described herein.

241. On June 2, 2026, Plaintiff sent Defendant written notice of its violations of the CCPA, pursuant to Civil Code § 1798.150(b)(1). If Defendant fails to respond or has not cured or is unable to cure the violation within 30 days thereof, Plaintiffs will amend this Complaint to seek all relief available under the CCPA including damages to be measured as the greater of actual damages or statutory damages in an amount up to seven hundred and fifty dollars ($750) per consumer per incident. See Cal. Civ. Code § 1798.150(a)(1)(A) & (b).

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all similarly situated Class Members, prays for judgment against Defendant and requests from the Court the following:

A. For an order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

B. For an award of damages, including actual, nominal, and consequential damages, as allowed by law in an amount to be determined at trial;

C. For an award of attorneys' fees and costs as allowed by law;

D. For prejudgment interest on all amounts awarded; and

E. Such other and further relief as this Court may deem just and proper.

## VIII. JURY TRIAL DEMANDED

Plaintiffs, individually and on behalf of the Class, hereby demand a trial by jury on all claims so triable.

Dated: June 4, 2026,

Respectfully submitted,

By: *<u>/s/: Mark K. Svensson</u>*

Mark K. Svensson (NY 5974290)
**MILBERG, PLLC**
405 East 50th Street
New York, New York 10022
Tel: (202) 975-0468
msvensson@milberg.com

Mariya Weekes (admitted *pro hac vice*)
**MILBERG, PLLC**
333 SE 2nd Avenue, Suite 2000
Miami, FL 33131
Tel: (786) 206-9057
mweekes@milberg.com

Courtney Maccarone (NY Bar No. 5030150)
**KOPELOWITZ OSTROW P.A.**
1 W Las Olas Blvd, Suite 500
Ft. Lauderdale, FL 33301
Tel: (954) 525-4100
maccarone@kolawyers.com

Scott J. Falgoust (admitted *pro hac vice*)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com

*Counsel for Plaintiffs and the Putative Class*